Theodore C. **GERNER**, Plaintiff,

v.

**MOOG INDUSTRIES, INC.**, Defendant.

No. 64 C 432(2).

United States District Court
E. D. Missouri, E. D.

June 8, 1966.

C. Perry Bascom, Bryan, Cave, Mc-Pheeters & McRoberts, St. Louis, Mo., Harvey B. Jacobson and Harvey B. Jacobson, Jr., Washington, D. C., David C. Johnston, Sr., Oklahoma City, Okl., Robert F. Davis, Washington, D. C., for plaintiff.

Gravely, Lieder & Woodruff, Mellitz & Frank, St. Louis, Mo., for defendant.

MEREDITH, District Judge.

This matter was tried to the Court without a jury and the Court has been duly advised by testimony, documentary evidence and briefs of all the parties and makes the following findings of fact and conclusions of law:

Plaintiff, Theodore C. Gerner, is a citizen of The United States and a resident of the State of Oklahoma and defendant, Moog Industries, Inc., is a Missouri corporation having its principal place of business at St. Louis, Missouri. Plaintiff Theodore C. Gerner is the owner of United States Patent 3,044,798, granted July 17, 1962, the patent involved in this suit. This is an action for infringement of the Gerner patent, particularly claims 1, 4 and 5. The Court has jurisdiction over the parties and of this cause of action, under 28 U.S.C. § 1338(a) and § 1400(b). The plaintiff relies on claim 1 as being exemplary of the infringement issue. The plaintiff through his company, National Machine Works, Inc., began selling idler arms manufactured in accordance with his patented invention during the year 1960.

Claim 1 of the Gerner patent is stated as follows:

"A replacement assembly for idler arms of an automobile steering linkage comprising an idler arm having a pivotal connection at one end for journaling the same upon the chassis of an automobile and having a pivotal connection at its other end for engagement with a portion of a steering link-

Fig.1

Fig.2

Fig.3

Theodore C. Gerner
*INVENTOR.*

BY *Clarence A. O'Brien
and Harvey B. Jackson*
*Attorneys*

DEFENDANT'S EXHIBIT A

age, at least one of said pivotal connections including a female member having a bore therein and a male member received therein, said male member including diametrically enlarged reversely varying surfaces, upper and lower wedge means each slidably received in and engaging the wall of the

bore in said female member and having wedging surfaces complementary to and engaging those of the male member, resilient means yieldingly and continuously urging said wedge means into wedging contact with said male member and the female member whereby to automatically take up wear therebetween, said diametrically enlarged reversely varying surfaces being conical."

The Gerner invention is best illustrated by Figure 2 of the patent drawings (plaintiff's exhibit 1 and defendant's exhibit A), a copy of which is attached hereto, and plaintiff's exhibit 2, a prototype model. In Figure 2 of the patent drawings, the frame bracket end pivotal connection is at the right-hand end. The assembly of this pivotal connection is identical with that illustrated in the cross section on the left-hand end, except it is disposed in reverse position.

The purpose of the Gerner idler arm is to rid the automobile steering linkage of all play.

The Gerner idler arm has at the frame bracket end a female housing with a cylindrical bore therein. The bore receives three lower wedge elements which are slid to the bottom of the bore. The male pin with upper and lower reversely varying conical surfaces is positioned in the bore whereby the lower conical surface contacts the interior surface of each lower wedge element. Three upper wedge elements are then slid into the bore with their interior surfaces each contacting the upper conical surface of the male pin. The exterior surface of each upper and lower wedge element is cylindrical and makes such contact with the bore as to inhibit relative rotational movement. The interior surface of each upper and lower wedge element is conical and contacts the corresponding upper and lower surface of the male pin to permit relative rotation therebetween. Accordingly, the bearing surfaces for the pivotal connection are those surfaces on the interior of the wedge elements and on the male pin which are in contact.

The three upper and the three lower wedge elements represent axially spaced supports which at any time define a stationary rotational axis for the idler arm at the frame bracket end pivotal connection. A spring in combination with a cover maintains the contact of the male pin surfaces with the interior surfaces of all the wedge elements.

The spring in urging the three upper wedge elements onto the upper bearing surface of the male pin forces the three upper and three lower wedge elements to expand due to the conical shape of the upper and lower bearing surfaces of the male pin. The force expanding the upper and lower wedge elements produces a wedging contact between their exterior cylindrical surface and the bore surface. The downward force on the three upper wedge elements also urges the male pin into its lowermost position with its lower bearing surface against the interior conical surface of each lower wedge element which in turn are each in contact with the bore. Thus, any machining imprecision existing between the bore, the wedge elements and the male pin is automatically compensated for and any looseness which might otherwise exist is eliminated.

As wear takes place during normal operation between the two conical surfaces of the male pin and the interior surfaces of the six wedge elements, the spring forces the three upper wedge elements further into the bore against the upper conical surface of the male pin and forces the male pin down on the three lower wedge elements, thereby taking up any wear therebetween and at the same time causing all the wedge elements to expand further (if necessary) against the surface of the bore. Accordingly, all wear occurring in the pivotal connection is automatically taken up by adjustment of the three upper and three lower wedge elements and the male pin.

In the event the pivotal connection is subject to a shock whereby the upper or lower conical surface of the male pin is temporarily dislodged from contact with any of the three upper wedge elements or three lower wedge elements, the force of the spring will automatically reset con-

tact of the components in the same manner as described above with respect to assembly of the pivotal connection.

Defendant is presently manufacturing a series of idler arm structures illustrated by plaintiff's exhibit 8a through 8r, which are drawings of the structures, plaintiff's exhibits 4, 5 and 6, physical models, and defendant's exhibit I, an illustrative model of the Moog structure. Defendant's exhibit D, a drawing of the structures, is attached hereto.

DEFENDANT'S EXHIBIT D

MOOG IDLER ARM

Defendant had been manufacturing and selling a ball bearing idler arm kit for many years prior to the Gerner patent, which eliminated looseness. The idler arms of Moog, which plaintiff contends infringes his patent, were designed in 1963. The engineers of defendant Moog had examined the Gerner structures, as well as those of other competitors, and the prior art, before designing the questioned structures.

In comparing the Gerner idler arm and the Moog idler arm there are certain differences apparent.

The three lower and three upper wedge elements of Gerner are loosely slidably received in the bore of the female member. These wedge elements engage the reversely tapered surfaces of the male pin and the spring on the upper wedge elements permit a yielding and continuously urging of the wedge elements into wedging contact with the pin.

In the Moog device the lower element is a solid ring element which is forced by pressure into the female housing and remains fixed at that point. It is not three separate wedge elements. It cannot slide up and down.

It is to be noted here that the language of claim 1 of the Gerner patent is as follows:

"* * * upper and lower wedge means each slidably received in and engaging the wall of the bore in said female member and having wedging surfaces complementary to and engaging those of the male member, * *"

The three upper wedge elements of Moog and the bottom ring have only point contact with the male pin. In Gerner the surfaces of the wedge elements have complementary conical surfaces that contact the male pin.

The spring in Moog has no effect on the bottom element which is fixed, but only urges point contact of the upper wedges with the male pin. The spring in Gerner urges continuous wedging of both the top and bottom wedge elements with the male pin.

Even if this Court were to find the Gerner patent valid, the difference between Moog and Gerner makes it doubtful if there is any infringement. However, it is not necessary to decide this question in view of the fact that after reviewing the prior art this Court is of the opinion that the Gerner patent does not stand the tests necessary to make it a valid patent.

The Constitution, Art. I, § 8, cl. 8, authorizes Congress "To promote the Progress of * * * useful Arts, by securing for limited Times to * * * Inventors the exclusive Right to their * * * Discoveries." The Supreme Court in Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966), pointed out

"The clause is both a grant of power and a limitation. * * * Congress may not authorize the issuance of patents whose effects are to remove existent knowledge from the public domain, or to restrict free access to materials already available."

The Court said further in quoting Hotchkiss v. M. Greenwood & Co. (S.Ct.1851), 11 How. 248, l. c. 267, 13 L.Ed. 683:

"[U]nless more ingenuity and skill * * * were required * * * than were possessed by an ordinary mechanic acquainted with the business, there was an absence of that degree of skill and ingenuity which constitute essential elements of every invention. In other words, the improvement is the work of the skilful mechanic, not that of the inventor."

The Court went on to emphasize that Congress in § 103 of the 1952 Patent Act has made the language of Hotchkiss a statutory condition by requiring the invention to be one that was not obvious to a person skilled in the arts, when comparing the invention to the prior arts.

In a recent case, Kell-Dot Industries, Inc. v. Graves, 361 F.2d 25, (May 18, 1966), the Eighth Circuit in reversing

the district court and finding a patent invalid, said at page 30:

"We are convinced here that anyone skilled in the art with patent office references before him could have, without the exercise of any inventive faculty, combined old elements known to the art and made plaintiff's machine. Assuming that the patent in suit was an improvement over the prior art, it still does not rise to the level of patentability."

The facts in the Gerner patent fall within the language of the Eighth Circuit and the Supreme Court in that the Gerner patent is invalid because it is an obvious change to anyone skilled in the arts and does not rise to the standard necessary to make it patentable.

The file jacket of the Patent Office shows that all claims were initially rejected. After minor changes seven of the claims were allowed. Reference was made by the Patent Office to the following prior art: 1,261,856, Rule; 1,871,-861, Rossman; 1,985,728, Ingersoll; 2,-037,786, Hufferd; 2,048,803, Marles; 2,544,582, Booth; 2,745,688, Farrington; 2,853,327, Traugott; and foreign patent 513,858, Italy (Sell).

The defendant relies on the referenced prior art and additional patents: Swiss, 111900; Greenwalt, 2,685,451; Cain, 2,-769,651; Prichard, 2,826,466; and Herbenar, 2,937,033 and 2,944,829.

The Ingersoll patent granted in 1934 is a ball and socket joint used in cross tie rods connecting the steering arms of the front axle in motor vehicles. This patent drawing shows almost the identical principal applied in Gerner. Figures 1, 2 and 3 of defendant's exhibit B, a copy of which is attached hereto, show socket pieces with reversely tapered surfaces, slidably received into the base of a housing, an upper and lower set of rings having tapered surfaces engaging the tapered surfaces of said socket pieces, and a spring to force the rings in continuous contact with the tapered surfaces of the socket pieces. The patent additionally has a ball shaped stud within the tapered socket pieces. The principle of Ingersoll is not greatly different from Gerner.

The Swiss patent granted in 1925, while being used as a connecting joint for shock absorbing mechanisms shows a similar device to Gerner's. Defendant's exhibit F (figure 16), a copy of which is attached hereto, shows the reversely tapered pin fitting into a pivot assembly with two wedging rings fitting against the reversely tapered pin. The rings fit into a housing and in this instance there is a leaf spring (defendant's exhibit F, figure 19), which may be used to maintain the relative position of the bearing surfaces.

The Hufferd patent granted in 1931 is an improved form of adjustable ball joint connection for the tie rod and drag links used in the steering mechanism of automobile vehicles. The patent has the ball stud surrounded by positioned tapered sleeves with a spring to take up wear and not affect the alignment of the tie rod. The spring forces the wedgelike segments together.

Without going into all the other referenced patents, but considering briefly Cain, granted in 1956, for an adjustable idler arm support and Herbenar, granted in 1960, for a vehicle idler arm assembly, we can see that Gerner is basically a slightly different arrangement of the art which is already patented or in the public domain.

Fig. 5.

Fig. 4.

Fig. 2.

Fig. 9.

Fig. 8.

Fig. 7.

Fig. 6.

Fig. 3.

Fig. 1.

INVENTOR

George B. Ingersoll.

DEFENDANT'S EXHIBIT B

SWISS PATENT 111900, GRANTED 1925, DEFENDANT'S EXHIBIT F

When the patent drawings of Gerner, the Swiss patent and the Ingersoll patent are placed side by side, and the pertinent characteristics are set out in identical colors, it is clear to anyone skilled or unskilled how little variation in fact exists between Gerner and the prior art. Therefore, copies of these drawings together with a cross section of the Moog device are attached to and made a part of this opinion for the purpose of clarity.

The plaintiff tries to get some comfort from the case of United States v. Adams. 383 U.S. 39, 86 S.Ct. 708, 15 L.Ed.2d 572 (1966), but the facts in that case are very different. In that case the Court found the device passed the separate tests of novelty, nonobviousness and utility. The battery was the first water-activated battery ever invented. The Patent Office cited not a single reference when it was granted. After the patent was furnished to the Army and Navy in 1941 and tests were made and the battery was studied for a year, the National Bureau of Standards experts had doubts that the battery would work. So, certainly it was not obvious to one skilled in the field.

The Patent Office in Gerner did not consider or reference Cain or the Swiss patent 111900. Had these been considered, they may have reached a different result.

The Court agrees with the plaintiff that the grant of a patent carries with it a presumption of validity. However, this is a rebuttable presumption, Steffan v. Weber Heating & Sheet Metal Co., 237 F.2d 601 (8 Cir. 1956), and validity of an invention is ultimately a question that the courts must decide, Continental Farm Equip. Co. v. Love, Tractor, Inc., 199 F.2d 202 (8 Cir. 1952).

The Gerner patent when considered with the prior art and particularly that not cited by the Patent Office is invalid because the combination of old elements is obvious to anyone with ordinary mechanical skill.

Accordingly, a judgment will be entered for the defendant and against the plain-

tiff. Defendant's counsel is directed to prepare the judgment in accordance with this memorandum and submit the same to the Court and a copy to counsel for plaintiff within 10 days.