386 F.2d 909
 Application of John M. SAARI and William C. Wiley.
 Patent Appeal No. 7809.
 United States Court of Customs and Patent Appeals.
 November 24, 1967.
 
 Richard T. Seeger, Detroit, Mich., Emory C. Naylor, Washington, D. C., James L. O'Brien, Detroit, Mich., for appellants.
 Joseph Schimmel, Washington, D. C. (Fred W. Sherling, Washington, D. C., of counsel), for Commissioner of Patents.
 Before WORLEY, Chief Judge, RICH, SMITH and ALMOND, Judges, and Judge WILLIAM H. KIRKPATRICK.*
 ALMOND, Judge.
 
 
 1
 This appeal is from the decision of the Board of Appeals affirming the rejection on prior art of claims 9 and 10 of appellants' application[1] entitled "Mass Spectrometer Beam Definition Device." No claim is allowed.
 
 
 2
 The invention relates to "time of flight" mass spectrometers of the right angle entry type wherein gaseous molecules, which are either received in ionized state or ionized in the spectrometer, are accelerated electrically in a direction perpendicular to their original direction and the accelerated ions are received and measured by means which distinguish them according to their masses. More specifically, the ions are exposed to a pulsed accelerating field so as to be directed toward a collector forming part of a detecting means. The time of arrival of the ions accelerated by each pulse is determined by their respective masses since the lighter ions are accelerated more than those of greater mass. The detecting means operates in synchronism with the accelerating pulses to provide an indication of the relative number of ions of each mass in the beam.
 
 
 3
 As noted by appellants, the right angle entry feature minimizes the background or stray ions in the output of the spectrometer so that the measurement is a more true representation of the quantity of source particles which it is desired to analyze. Thus stray or background ions are accelerated substantially in the direction of the accelerating field while the source particles are accelerated in a direction which is the resultant of the initial entry velocity and the velocity imposed by the accelerating field and the collector is located in the latter direction.
 
 
 4
 Appellants point out that the right angle direction of the accelerating field causes less bending from the original direction of the heavier ions than the lighter ones so that the ions of different masses in the beam directed toward the collector tend to diverge. They state that electric or magnetic fields may be provided to act on the accelerated beam in a direction transverse to the beam to provide a converging force which tends to overcome the divergence and results in a greater proportion of the source particles falling on the collector. In a first embodiment, appellants employ a constant electric field for converging purposes, stating that the heavier particles are deflected more than the lighter particles because such heavier particles are slower and thus are under the influence of the field for a longer time.
 
 
 5
 In a second embodiment, appellants describe analysis of ionized particles collected from the atmosphere by a satellite. The ionized particles thus have the same speed in their original direction irrespective of their masses. The field for applying a converging force to the ions transverse to their accelerated direction is provided by an electric voltage applied to a pair of deflecting plates. The voltage signal is varied in synchronism with the pulses accelerating the particles so that it increases with time as the ions travel toward the collector during each acceleration period to overcome the divergence which would otherwise occur.
 
 
 6
 Another embodiment differs from that just described in that the structure for producing the varying electric deflecting field is replaced by means producing a constant strength magnetic field in a direction transverse to the accelerated direction of the ions to produce a similar converging effect thereon.
 
 
 7
 Claims 9 and 10, respectively, are directed to the aforementioned latter two embodiments and read:
 
 
 8
 9. An acceleration system for charged particles comprising,
 
 
 9
 particle accelerating means,
 
 
 10
 means for conducting charged particles traveling in a first direction towards said particle accelerating means,
 
 
 11
 substantially all of said charged particles traveling in said first direction having the same speed,
 
 
 12
 said particle accelerating means having an accelerating field direction other than said first direction for accelerating said charged particles in a resultant direction,
 
 
 13
 particle receiving means positioned in a path of said resultant direction a predetermined distance from said accelerating means for receiving charged particles traveling only in said resultant direction,
 
 
 14
 control means situated along the resultant direction for imparting a force to the particles as they pass a distance through said control means to reduce particle divergency and influence said particles to travel a uniform common direction thereby establishing better beam definition,
 
 
 15
 said control means comprising means for applying an increasing electric field in a direction having components transverse to said resultant direction to apply a correction force to said particles to minimize the divergency of said particles.
 
 
 16
 10. An acceleration system for charged particles comprising,
 
 
 17
 particle accelerating means,
 
 
 18
 means for conducting charged particles traveling in a first direction towards said particle accelerating means,
 
 
 19
 said particle accelerating means having an accelerating field direction other than said first direction for accelerating said charged particles in a resultant direction,
 
 
 20
 particle receiving means positioned in a path of said resultant direction a predetermined distance from said accelerating means for receiving charged particles traveling only in said resultant direction,
 
 
 21
 control means situated along the resultant direction for imparting a force to the particles as they pass a distance through said control means to reduce particle divergency and influence said particles to travel a uniform common direction thereby establishing better beam definition,
 
 
 22
 said control means comprises means for exerting a constant magnetic field which is in a direction to change the course of the charged particles to cause said charged particles to converge.
 
 The references relied on below are:
 
 23
 Benson et al. 2,938,116 May 24, 1960
 (Benson)
 Schroeder 2,696,561 December 7, 1954
 
 
 24
 Van Nostrand's Scientific Encyclopedia published by D. Van Nostrand Co., Inc., 3rd Ed., 1958, pages 1030-1033.
 
 
 25
 Benson discloses a time of flight mass spectrometer utilizing a right angle entry system. The spectrometer utilizes a deflecting means shown in figure 7 of the patent for applying a converging force on the ions traveling toward the collector. The system comprises two focusing plates across which a constant electrical voltage is applied.
 
 
 26
 Schroeder discloses certain mass spectrometers wherein time of flight is utilized to distinguish ions of different mass and others which distinguish between different ions by the action of deflection means which focus them at different locations or at the same locations at different times. It discloses the use of electric deflecting fields provided by either a steady uniform voltage or by voltage pulses, magnetic fields which are either constant or variable, and combinations of electric and magnetic fields, including a variable electric field used with a constant magnetic field.
 
 
 27
 Van Nostrand describes mass spectrometers generally and includes a description of an instrument known as the Aston mass spectrometer. In that device, a magnetic field is used to focus an ion beam to produce charge lines on a photographic plate which receives the ion beam.
 
 
 28
 The issue here is obviousness under 35 U.S.C. 103. Aside from that issue, there is no significant legal question in dispute.
 
 
 29
 Claim 9 stands rejected on Benson taken in view of Schroeder on the ground that the latter reference would make it obvious to employ a variable electric deflection field in place of the constant field employed in Benson. Claim 10 was rejected as unpatentable over Benson on the ground that it would be obvious to substitute a constant magnetic field for the constant electric field as the ion stream converging means in Benson. The examiner and the board both regarded magnetic and electric fields as known equivalents for deflecting charged particles, referring, respectively, to Van Nostrand and Schroeder as supporting that position.
 
 
 30
 Appellants urge that the board erred in the rejection of claim 9 because the deflecting plates of Benson et al. are for focusing an ion beam while the deflecting plates in Schroeder are for separating an ion beam and it is not believed that one skilled in the art would be led to two patents of opposing objects to solve a problem. They also urge that Schroeder's disclosure of a great many embodiments would make it difficult for one skilled in the art to select a particular portion of a particular embodiment to combine with Benson. They further contend that "[p]revious systems have used constant voltage fields for constant energy source particles while this invention uses a variable voltage field for convergence of constant velocity source particles."
 
 
 31
 We do not find any significant distinction in this last contention of appellants. While claim 9 is limited to an arrangement in which substantially all the charged particles are traveling at the same speed when received in the system, the subsequent action of the accelerating field on the particles causes those of different masses to travel at different velocities and it is those very differences in velocity that are utilized for segregating the particles by mass according to their time of arrival at the collector. The issue with respect to claim 9 is simply whether the teachings of Schroeder would make it obvious to a person of ordinary skill in the art to substitute for the means for applying a constant strength electric field in Benson a means for applying an increasing electric field.
 
 
 32
 In support of the rejection, the examiner pointed out that Schroeder shows that electrostatic fields impressed on ions in a mass spectrometer to control their deflection may be constant or variable and regarded it obvious that the same is true for control means of the type disclosed by Benson. Nothing is seen in appellants' arguments to controvert that position successfully. It seems apparent that a person of ordinary skill in the art with Schroeder before him would be aware of what differences in deflection effects would be produced by a constant electric field on the one hand and a variable or increasing field on the other and would be qualified to choose between such fields in accordance with the effect desired.
 
 
 33
 Moreover, the examiner further specifically suggested that it would be obvious "to employ the variable electrostatic field control means shown in Figs. 19 and 21 of Schroeder in place of the constant electrostatic field control means 135 (Fig. 7) of Benson et al." The forms of the Schroeder device shown in those two figures apply short voltage pulses to the deflecting plates in synchronism with pulses accelerating the ions initially. Obviously referring to that feature of Schroeder, the solicitor urges:
 
 
 34
 Further, appellants' claims do not specify any particular manner of applying increasing voltage to the deflection means, and no reason has been advanced why a pulsating voltage synchronized with the acceleration pulses as taught by Schroeder would not be suitable.
 
 
 35
 Observing that appellants have not responded to that argument of the solicitor and that the terminology of claim 9 is indeed as broad as urged, we conclude that the rejection of the claim on the basis of the substitution of a pulsating deflecting voltage for energizing the deflecting plates of Benson is free of reversible error. Therefore, the decision as to claim 9 is affirmed.
 
 
 36
 Claim 10, being drawn to a different aspect of the invention, raises a somewhat different question. The examiner stated that "it is well known that magnetic or electrostatic fields are fully equivalent for the purpose of particle deflection," and referred to the Aston mass spectrometer described in Van Nostrand as involving the use of a magnetic field to focus an ion beam. The board referred to Schroeder as evidence that electric and magnetic fields can be used interchangeably to deflect a beam of charged particles.
 
 
 37
 We think that each of Van Nostrand and Schroeder would suggest to a person skilled in the art that a constant magnetic field be provided in place of the constant electric field disclosed by Benson for focusing the ions in the beam. Van Nostrand clearly discloses that a magnetic field may be used to focus a beam of ions. While the electric and magnetic fields of Schroeder are used in different systems than that of Benson, the former patent does reveal that the two types of fields can be used to produce similar effects on charged particles.
 
 
 38
 Appellants assert that Benson and Schroeder show that the involved art is a crowded one and urged that "smaller steps forward are deemed patentable" in such circumstances. However, the criterion on which patentability must be resolved here is obviousness under 35 U.S. C. § 103 and, on that basis, we are convinced from the record and arguments that claims 9 and 10 are not patentable.
 
 
 39
 It is noted that appellants have not discussed the merits of the Van Nostrand reference in their brief. Instead, they refer to a reference, cited for the first time in the Examiner's Answer, that "allegedly shows a magnetic field for the focusing of ions." They assert that they "have not had sufficient time to examine the reference" and contend that prosecution should be reopened if the reference is used. We find no merit in this complaint since the reference was cited and referred to by the examiner and this is not the appropriate time or place to seek reopening of the case.
 
 
 40
 The decision of the board is affirmed.
 
 
 41
 Affirmed.
 
 
 42
 (Benson)
 Schroeder 2,696,561 December 7, 1954
 
 
 
 Notes:
 
 
 *
 Senior District Judge, Eastern District of Pennsylvania, sitting by designation
 
 
 [1]
 Serial No. 229,519, filed October 5, 1962
 
 
 
 43
 SMITH, Judge (concurring in part and dissenting in part).
 
 
 44
 While I agree with the majority that claim 10, on the record before us, would have been obvious at the time the invention was made under 35 U.S.C. § 103, I would reverse the decision of the Patent Office rejecting claim 9 on the same statutory basis. Initially, I believe that additional background material relative to appellants' invention should be set forth, including a discussion of the problem faced by appellants in making this invention, to provide a broader understanding of the basis for my disagreement with the majority.
 
 
 45
 As appellants state, the invention relates to a mass spectrometer beam definition device which may be used in a constant velocity, "right angle entry" mass spectrometer system. A right angle entry system, which appellants admit is known to the art, is one in which the source particles are introduced into the spectrometer in a direction which is generally normal to the accelerating direction. A purpose of such systems is to minimize the presence of background ions in the detected output of the spectrometer. As appellants' specification states:
 
 
 46
 * * * The background ions are accelerated substantially in the direction of the accelerating field while the source particles are accelerated along a direction which is a combination or resultant of the initial entry velocity and the accelerating field and in this manner the two groups may be distinguished by placing a collector only in the resultant direction.
 
 
 47
 A problem in this art and appellants' solution to the problem is described in the specification in the following terms:
 
 
 48
 One difficulty arising in this method of depressing background ions is that the resultant direction of the heavy source particles is slightly different than that for the lighter source particles so that the resultant beam of source particles is divergent. This is undesirable since it makes it more difficult to distinguish from the background ions and also some of the source particles may be lost due to the divergency.
 
 
 49
 This invention alleviates this problem by applying energy to a deflecting device through which the resultant beam passes in such a manner so as to maintain the beam definition by substantially eliminating the aforementioned divergency.
 
 
 50
 The appellants have arguably distinguished their device in two respects: (a) the nature of the field provided by the deflecting device, and (b) the characteristics of the source particles.
 
 
 51
 As to these distinctions, appellants explain that the deflecting device may provide either an electric or an electromagnetic field through which the beam of source particles passes. To establish a deflecting electric field, a voltage is provided between a pair of parallel plates between which the particles pass on their path to the detector. The characteristics of the applied voltage depend on the characteristics of the entering source particles. Appellants urge that if the energy of the source particles is constant, such as would be the case when particles are obtained from a solid source by heating and sublimation, a constant voltage would maintain the beam definition if the voltage were related to the constant energy. Since the energy of different particles is the same, heavier particles are slower, and lighter particles are faster.
 
 
 52
 On the other hand, if the source particles have a constant velocity, appellants state, such as would occur if they were obtained by a satellite measuring the atmosphere, a variable voltage across the parallel deflecting plates would maintain beam definition. In this instance, beam definition is provided by higher voltage applied to the deflecting plates as the heavier, slower ions pass between the plates to deflect these ions more than the lighter ions. Both the heavier and lighter ions have, of course, entered the system at the same velocity, but the result of the accelerating field, in a direction normal to the direction of entry, on the speed of the particles differs.
 
 
 53
 As to the first embodiment, appellants' brief urges that previous systems have used constant voltage fields for constant energy source particles while the invention uses a variable voltage field for convergency of constant velocity source particles. The appellants' choice of this terminology may be somewhat unfortunate since claim 9 asserts in part that:
 
 
 54
 * * * said control means comprising means for applying an increasing electric field in a direction having components transverse to said resultant direction to apply a correction force to said particles to minimize the divergency of said particles. [Emphasis added.]
 
 
 55
 In order to grasp more significantly the meaning of this language as used in the claim, it is necessary to consider certain portions of appellants' specification, as we must under United States v. Adams, 383 U.S. 39, 86 S.Ct. 708, 15 L.Ed. 2d 572 (1966) where the Supreme Court specifically pointed out, Id. at 48-49, 86 S.Ct. at 713, that:
 
 
 56
 * * * While the claims of a patent limit the invention, and specifications cannot be utilized to expand the patent monopoly * * * it is fundamental that claims are to be construed in the light of the specification and both are to be read with a view to ascertaining the invention * * *. [Citations omitted.]
 
 
 57
 Thus, on the characteristics of the voltage applied to the deflecting plates for deflecting the accelerated particles, appellants state:
 
 
 58
 * * * The higher energy particles would have a different accelerated direction than the lower energy particles and this can be compensated for by voltage source 42a putting a varying voltage on the deflecting plates 41a. The voltage is synchronized with the pulses applied to grids 28a and 30a and increases with time as the ions were traveling by during a single acceleration period, and the lighter, lesser energy ions do not get as much deflecting voltage as the later heavier, larger energy ions. [Emphasis added.] * * *
 
 
 59
 Thus, reading that portion of the claim pertinent to this discussion in light of the specification, it is clear that the voltage applied to the parallel plates must (1) be synchronized with the pulses applied to the accelerating means to provide the accelerating field and (2) increase with time as the ions pass between the plates during a single acceleration period.
 
 
 60
 The examiner, in both his final rejection and his answer on appeal, and the board itself, seem to have considered claim 9 as defining a variable voltage, contrary to the expressed wording of the claim and the explanations of the specification. In his answer the examiner states:
 
 
 61
 * * * claim 9 sets forth the embodiment of Fig. 4 of appellants' drawings which employs a control means comprising a variable voltage applied to the plates to provide a variable electrostatic field. The secondary patent to Schroeder shows that electrostatic fields may be constant (Figs. 14 to 16) or variable (Figs. 19 and 21) and may be used alternately to produce the separation of ions. It is obvious that such relationship exists for the control means of the type disclosed by appellants and Benson et al. Therefore, it would be obvious to one of ordinary skill in the art to employ the variable electrostatic field control means shown in Figs. 19 and 21 of Schroeder in place of the constant electrostatic field control means 135 (Fig. 7) of Benson et al. * * * The solicitor's brief describes the Schroeder reference in detail, but as to its teaching of the nature of the voltage to be applied to the deflecting plates, states:
 
 
 62
 * * * Also, a pulsating voltage may be applied to electrostatic deflection electrodes to deflect the ions. * * *
 
 
 63
 The Schroeder patent describes the embodiments on which the solicitor relies as including a relatively short duration, accelerating pulse applied to the accelerating electrode. A similar deflecting pulse of short time duration and synchronized with the accelerating pulses is described as being utilized to provide selective deflection of ions of a predetermined atomic weight in order that the abundance of such ions may be measured by a target electrode. Figs. 19 and 21 of the Schroeder patent disclose conventional "square wave" pulse waveforms applied to the deflecting plates. Nowhere in the reference does there appear a teaching that the pulse is an "increasing" pulse to provide an "increasing electric field" as claimed, and as described in the specification as increasing with time during a single acceleration period.
 
 
 64
 It is arguable that the leading edge of any one pulse, as illustrated in Schroeder, as applied to the deflecting plates, may be considered an increasing voltage to provide the claimed "increasing electric field." This position, however, it seems to me, does not meet a reasonable construction of the claim, in the light of the specification which requires that the pulse increase with time during a single acceleration period. It would seem that appellants' contribution to the art, not shown by the references of record before us, is that of providing an increasing, rather than an increased electric field between the deflecting plates to achieve particle convergence. Such a concept is not taught by the application of a constant magnitude pulse during any one acceleration period, as taught by the Schroeder reference. On this basis, I do not think that claim 9 thus considered as a whole would have been obvious within the meaning of section 103.
 
 The board stated:
 
 65
 * * * In our opinion it would be within the skill of the art to feed the plates of the [Benson] reference through a rheostat to obtain any desired voltage between the plates particularly in view of column 8 of Schroeder. Benson et al., modified in this obvious manner, meets the structural limitations of claim 9 (Brackets added).
 
 
 66
 I do not think that, within the clear expression of the appellants' terms and disclosure, merely providing a device to meet "structural limitations" of claim 9 meets the statutory requirements for probative inquiry into an issue of obviousness. We deal here with the invention defined by claims construed in the light of the specification. The invention thus ascertained is not, in my view, made obvious by the selection of apparatus in the light of appellants' teachings which may be said to "meet" such "structural limitations."
 
 
 67
 The critical portion of appellants' combination claim 9 is expressed as a means for performing a specified function, statutorily permitted under 35 U.S.C. § 112. It seems that the board is criticizing the language of the claim, perhaps intimating that the language used is so "broad" that it differs from the references only by the provision of a rheostat. Initially, I observe no teaching in the references that a rheostat would provide the claimed function, nor any teaching that, if provided, a rheostat would be likely to apply an electric field increasing in time during a single acceleration period. Nor does it seem to me that the provision of a rheostat would necessarily minimize the divergency of the particles. Thus, I do not think that appellants' claimed invention as a whole, as claimed in claim 9, would have been obvious to one of ordinary skill in the art at the time it was made. Accordingly, I would reverse the decision of the board affirming claim 9.
 
 
 68
 On the other hand, I concur in the majority's affirmance of the decision of the board as to claim 10 for the reasons stated in the majority opinion.