55 CCPA

**Application of Thomas F. PETERSON.**
**Patent Appeal No. 7828.**

United States Court of Customs and Patent Appeals.
Feb. 15, 1968.

volving DANSK FORM, in which there was a dissent.

Henry L. Brinks, Robert L. Harmon, Chicago, Ill. (Clyde F. Willian, Chicago, Ill., of counsel), for appellant.

Joseph Schimmel, Washington, D. C. (Jere W. Sears, Washington, D. C., of counsel), for the Commissioner of Patents.

Before WORLEY, Chief Judge, RICH, SMITH and ALMOND, Judges, and WILLIAM H. KIRKPATRICK.*

KIRKPATRICK, Judge.

This appeal is from the decision of the Board of Appeals affirming the rejection of claims 4, 5, 7, 8 and 9 of appellant's application serial No. 96,522, filed March 17, 1961, for "Appliance for Linear Bodies." The board reversed the rejection of two other claims.

The invention relates to appliances for use with suspended linear bodies, such as electrical conductors and the like, which appliances are constructed from elements helically formed prior to application to the linear bodies. The specification acknowledges that appliances constructed from preformed helices enjoy widespread usage, referring to certain of appellant's previously issued patents disclosing such appliances and particularly to one such appliance which is "especially suited for mechanically splicing two lengths of a linear body and maintaining the ends in a closely spaced relationship" and which "has enjoyed considerable commercial success."

However, it is further stated in the specification that several disadvantages resulted where a splice is "constructed in the conventional manner" to splice two electrical conductors together with the helically formed construction being used to "shunt" the current from one conductor to the other. The disadvantages include the fact that the contact resistance between the appliance elements and the conductors is not uniform because the elements are forced to expand in a way that results in varying pressure and because non-conducting oxide may be present along the contact lengths. Those conditions are said to cause uneven distribution of current in the elements with the result that those elements carrying a larger portion of the current are apt to become overheated and subject to oxidation. It is also said that a high current load on one of the elements may tend to cause discharge and arcing between elements and between elements and conductors.

The specification further states:

The subject invention has the foremost feature of providing a homogeneous distribution of current and thus obviating the difficulty encountered with prior art splices and other similar appliances constructed from helically formed elements where the appliance shunts current around another splicing device. At the same time, the subject invention includes substantially all of the advantages of appliances constructed from helically formed elements, such as ease of applicability, natural resiliency, gripping characteristics, minimum of stress concentration and the like.

Briefly, the invention may be characterized as a plurality of helically formed elements which include an intermediate portion in which the elements have been tightly intertwisted to form an essentially closed lay or stranded cable-like construction having an internal diameter substantially smaller than that of the portions adjacent their ends. In this manner the elements are forced into electrical and mechanical contact with each other. In some instances it may be desirable to twist the elements onto some suitable core material, such as conducting

---

* Senior District Judge, Eastern District of Pennsylvania, sitting by designation.

flock, shavings, wire, or a short strand, to further insure contact between the elements.

Constructions in accordance with the invention are shown in Figures 1 and 5 of the application drawings:

Figure 1 shows an embodiment used for electrically splicing two conductors in co-axial relationship. The helically formed elements 12 are applied to conductors C and C', respectively. The elements are helically formed throughout portions 14 and 16 to a pitch length and internal diameter slightly smaller than the external diameter of the conductors so that the elements tightly grip the conductors. Intermediate the portions 14 and 16, the elements are diverted from their normal helical courses to form two groups of elements 20 and 22. Each group includes approximately a half lay of the elements tightly intertwisted to form a closed lay having an internal diameter substantially smaller than that of the portions 14 and 16. The conductors in this construction are shown as mechanically spliced by a "wiped sleeve" construction 17 "of a conventional type."

The embodiment of Figure 5 is described in the brief as showing a spacing appliance "adapted to bridge between adjacent parallel conductors where it is desired to shunt current from one to another." There the appliance 50 includes spaced helical portions 14 and 16 which are of open pitch adapted to be wrapped around the conductors C and C', respectively. A tightly wound closed pitch helical portion 52 is formed between the portions 14 and 16.

Claim 5 is representative:

5. The combination comprising a pair of linear bodies, a plurality of elements which have been helically formed prior to application to one of said linear bodies along two spaced portions of their lengths to a mutually conforming internal diameter and pitch length of sufficient magnitude so that the helically formed portions may be applied to at least one of said linear bodies from the side without exceeding the elastic limit, said elements being intertwisted intermediate the helically formed spaced portions to form a closed lay having an internal diameter sub-

stantially smaller than the internal diameter of said helically formed spaced portions, the helically formed portions adjacent one end of said elements being wrapped around and coaxial with one of said linear bodies and the helically formed portions adjacent the other end of said elements being wrapped around and coaxial with the other of said linear bodies, said intertwisted portion being intermediate said linear bodies.

Other claims include such features as the linear bodies being arranged in parallel spaced relationship with the helically formed elements U-shaped or being disposed at right angles.

The references relied on by the board are:

Peterson   2,761,273   September 4, 1956
Peterson   2,959,632   November 8, 1960

The pertinent features of the Peterson '273 construction are best understood from Figures 3 and 6 thereof:

Fig. 3

Fig. 6

The object of the invention of this patent is "to apply helically-preformed elements in the formation of dead-ends and guy grips on wires, strands, cables, and rods, or to any other elongated body to which the teachings hereof are applicable."

Figure 3 shows a tubular body made up of helically-preformed elements which are "typical of those applied to the uses and purposes of the * * * invention." Figure 6 shows an arrangement wherein a bight B is formed at the end of a cable

C by means of a helical body having a closed lay 10 about the cable and a closed lay 5′ forming the bight.

Peterson '632 is primarily of interest for its showings in Figures 6, 7, 8 and 11.

Figure 6 shows helically-preformed part 20 embracing conductor C, with an intermediate part 22 carried over to a spaced conductor C′ in bridging relationship and thence along the latter at 24. One such preformed part may be so applied to space the conductors, or "another similar" part, such as that designated 20′, 22′ and 24′, may be applied also "to form a substantial circle or square through which the spacing function is carried out." In Figure 7, a bridge portion 26 may be disposed between helical parts 12 and 16 on the respective conductors C and C′. The arrangement of Figure 8 uses helical parts which are of the same shape as those of Figure 6 but have the bridged portions spaced farther apart. Figure 11 shows a similar construction including a plurality of helical devices.

The board considered it obvious under 35 U.S.C. § 103 to utilize the dead-end appliance shown in Figure 6 of Peterson '273 to form a splice. It also regarded

the disclosure of helically preformed members of U-shape engaging generally parallel linear bodies in Peterson '632 to suggest an analogous use for the helically formed device of Peterson '273.

The board stated that it found "a clear indication" of the alternative use of "the devices 10" of Peterson '273 for either a splicing or dead-end purpose to lie in the following statement in that patent:

> In order to increase the holding power of the envelopes 10 when used as splices or dead-ends, a suitable grit or abrasive, such as aluminum oxide, carborundum, etc., usually in a suitable liquid vehicle, may be applied between the envelope and the underlying body.
> * * *

■ Appellant has raised a preliminary question by renewing a motion, previously denied by this court, to remand the appeal to the Patent Office "for consideration of the availability of United States Patent No. 2,761,273 [Peterson '273] as a prior art reference against the claims on appeal." The basis for the motion is appellant's Peterson patent No. 3,007,300, which issued November 7, 1961 on an application filed September 20, 1946 and thus was copending with Peterson '273. No. 3,007,300 includes a disclosure of the Figure 6 embodiment of Peterson '273 and the statement quoted therefrom hereinabove referring to use of the envelopes 10 "as splices or dead-ends." Appellant takes the position that such remand would enable him to seek the benefit of the filing date of the application resulting in patent No. 3,007,300 and overcome Peterson '273 as a reference. Noting that appellant did not raise any question before the Patent Office of the effect of Peterson '273 and the present application being copending with No. 3,007,300 and that admittedly "[t]he Peterson '300 patent is not of record in this appeal," we find the renewed motion to raise no question not raised and considered prior to its initial denial. The motion is therefore denied.

In keeping with the tenor of the specification, the arguments of appellant are based on the advantages his device is asserted to have over the prior art structure *when used as an electrical connector*. Appellant urges that the Peterson '273 and '632 patents are not concerned with the problem solved by the present invention, stating:

> * * * there is no mention in either Peterson '273 or Peterson '632 (nor, indeed, in *any* record reference) of the fact that the normal use of helically preformed elements in conductive applications results in non-uniform current distribution among the elements. There is no recognition of the problems of arcing and corona discharge nor of the desirability of maintaining homogeneous current distribution.

Appellant also states:

> The claimed invention is directed to a *particular* splice, *or* a line spacer, or a tap wire hanger which is *so constructed as to provide uniform current distribution among the elements.*

It thus becomes a significant issue whether the advantages asserted to be possessed by appellant's device when constructed of electrically conductive material and used to make an electrical connection or splice are to be considered as evidence of unobviousness where the claims of the application are not limited to a device which is electrically conductive but also encompass a structure which is suitable for only a mechanical splice. Appellant urges on this point:

> The fundamental purpose of the present invention, to insure uniform current distribution, cannot be ignored, * * *.

As authority, he relies on United States v. Adams, 383 U.S. 39, 86 S.Ct. 708, 15 L.Ed.2d 572 (1966).

*Adams* involved a suit for infringement of a patent on a battery wherein a magnesium electropositive electrode and a fused cuprous chloride electronegative electrode were used in connection with a container receiving water as an electrolyte. Although claims 1 and 10 did not recite the water electrolyte, they were held valid. The court observed that,

taken with the stated object of disclosing a water-activated cell, the lack of reference to any electrolyte in claims 1 and 10 indicates that water alone could be used. It also considered it significant that other claims did include reference to specific electrolyte solutions and noted that an electrolyte is a necessary element of any battery, recognizing that the claims designated the recited subject matter as a battery.

In contrast to *Adams,* there is no warrant for attributing the property of electrical conductivity to the "linear bodies" or "plurality of elements" set out in the claims appealed here. Appellant discloses in his specification that "the invention is not limited to use as a shunt and may certainly be applicable in those instances where current is not to be transmitted by the appliance." Also, the examiner rejected the claims as incomplete under 35 U.S.C. § 112 in failing to recite the electrical conductivity feature but appellant induced the board to reverse that rejection, the board observing that "the Examiner appears to have overlooked the inherent mechanical capabilities thereof, in the way of a supporting or tying function, for example." Moreover, appellant does not argue that the claims are limited to an electrically conducting device but only contends that advantages which would arise from use as such should be considered in determining patentability.

Numerous decisions of this court demonstrate that the advantages which are said to arise when the device of the present claim is made of electrically conducting material to provide an electrically conducting splice are not material to the issue of patentability here. Thus, In re Kebrich, 201 F.2d 951, 40 CCPA 780 (1953) states:

Whatever may be the practice of the courts in the interpretation of claims in infringement proceedings in order to sustain patents once granted, it is very definitely settled by a line of consistent decisions rendered during a long period of time that in the initial consideration of the question of patentability neither the tribunals of the Patent Office nor the courts in reviewing their action may properly read unexpressed limitations into claims, and it is equally as well settled that, so limited, the tribunals and the reviewing courts in the initial consideration of patentability will give claims the broadest interpretation which, within reason, may be applied.

See also In re Fields, 304 F.2d 691, 50 CCPA 709 (1962).

This court said in In re Richards, 187 F.2d 643, 38 CCPA 900 (1951):

The right of an applicant to a patent is dependent not only upon the new and unobvious results his device will produce, but also upon whether or not the claims recite structure which would bring about those results. This court has held that the right of an applicant to a patent depends, not only on what his device will do but what he claims for it. [Citation omitted.] The court has also held that the particular feature or fact upon which an applicant predicates patentability must not only be disclosed in the specification but also brought out in the claims. [Citations omitted.]

More recently, the court decided In re Boice, 326 F.2d 1014, 51 CCPA 975 (1964), in which it declined to give weight to asserted advantages not supported by limitations in the claims. There it was stated:

It may be that there are specific size relationships in the embodiment of appellant's invention described in his specification which produced unexpectedly superior results; but if there are, they are not defined in his claims nor is any argument predicated on them beyond the contention that his "invention" would not be obvious from the teachings of the references. We are bound to treat the invention as it is claimed.

In the present case, it may well be that the advantages asserted to result from using appellant's disclosed structure

to make *electrically conducting splices* amount to unexpected superior results which would demonstrate unobviousness of claims limited to structure which will provide those results. However, the applied claims are not so limited and no unobvious results are shown to arise from the features they do require. On that basis we find no reversible error in the board's decision.

Thus the device of Figure 6 of Peterson '273 is assembled on the cable by first disposing a half-lay at one end of the elements about the end of the cable and then, with the central portion pretwisted to form a closed lay, intertwisting the open lay at the other end of the elements about the cable with the first open lay. We think that it would be obvious to dispose the open lay at the second end of the elements about a second cable to form a mechanical splice. We also think it would be obvious to modify the device of Figure 6 of Peterson '273 for use as a spacer between a pair of conductors in accordance with the Peterson '632 constructions. In particular, it would be obvious to dispose the open lay at one end of the device about one conductor and the open lay at the other end about the second conductor in the configuration shown for one of the two devices in the arrangements of Figures 6, 8 and 11 of the latter patent. Similarly, use of the device for mechanically splicing at right angles to a wire would be no more than an obvious adaptation of those modifications or that in the construction of Figure 6 of Peterson '273 similarly modified in accordance with Figure 7 of Peterson '632.

Since Peterson patent No. 3,007,300 is not of record and has not been considered by the Patent Office tribunals, we have not considered what effect its timely citation by appellant might have had, or what pertinent action he might have based thereon. It will also be noted that we have reached the conclusion that splicing appliances within the terms of the appealed claims are obvious over Peterson '273 and Peterson '632 without relying on the statement in the former, quoted here-inabove, specifically referring to use as splices and dead-ends.

The decision is affirmed.

Affirmed.

RICH, J., concurs in the result.