ELLIPSE CORPORATION, Plaintiff,

v.

FORD MOTOR COMPANY, Defendant.

No. 66 C 1421.

United States District Court,
N. D. Illinois, E. D.

Dec. 22, 1969.

Norman Lettvin and Robert C. Williams, of Bair, Freeman & Molinare, Chicago, Ill., for plaintiff.

George N. Hibben and Arlie O. Boswell, Jr., of Hibben, Noyes & Bicknell, Chicago, Ill., for defendant.

## JUDGMENT

PERRY, District Judge.

This matter came on before the court on the pleadings, including the Complaint and Amended Complaint of plaintiff Ellipse Corporation and the Answer thereto of defendant Ford Motor Company. The issues of validity and infringement of United States Letters Patent No. 2,628,568 have been duly tried before the court without a jury, the issue of damages having been separated from the issue of liability under Civil Rule 21 of this Court.

The court has heard argument of counsel, considered the testimony adduced, examined the exhibits and considered the briefs of counsel for the parties. Being fully advised in the premises, the court has this day entered simultaneously herewith its Findings of Fact and Conclusions of Law and in accordance therewith enters judgment herein as follows:

1. The portion of the Amended Complaint which avers that plaintiff is owner of U.S. Patent 2,628,568 and is entitled to recover damages for all infringement thereof by defendant's use and sale of certain accused pumps is sustained.

2. Claims 3 and 1 of U.S. Patent 2,628,568 are valid and have been infringed by defendant's manufacture, use and sale of the form of slipper-type pump used and sold by defendant as a power-steering pump.

3. It is, therefore, considered, ordered and adjudged that the plaintiff have judgment against defendant on account of said infringement. Plaintiff is entitled to damages therefor and to an accounting to determine its damage. The court now enters a final judgment herein for and in favor of the plaintiff herein and against defendant herein on the question of liability. The court reserves jurisdiction herein solely for the purpose of ordering an accounting by defendant to plaintiff and, after the taking of said accounting, to enter a money judgment herein for and in favor of the plaintiff and against the defendant in accordance with said accounting.

4. For the purpose of taking such accounting and determining said damages, the court does hereby appoint David J. Shipman as a Special Master in Chancery of this Court to take and hear testimony of the parties and to thereafter make a written report to the court on said accounting and a recommendation as to the final amount of the money judgment to be included in a decree herein. The court does now order that said Special Master in Chancery shall have the power to administer oaths, issue subpoenas duces tecum and shall have the power to order documents produced by either of the parties. The court further orders that said Special Master shall conduct and supervise all discovery proceedings, shall rule upon all motions concerning discovery, and shall order the taking of depositions or quashing of notices and rule on other routine and contested matters concerning discovery. The court does not intend that the Special Master in Chancery shall be consulted on the routine taking of depositions where there is no controversy between the parties. The Special Master shall report progress herein to the court within ninety (90) days after this judgment order becomes final by virtue of no appeal being taken within the time for appeal or after a mandate of affirmance in the event of appeal.

5. An accounting, to determine the amount of the damages including interest from the dates when the damages accrued, shall proceed to hearing in due course before said Special Master in Chancery after the parties have had an opportunity to complete their discovery of relevant facts. The discovery period is hereby set to close six (6) months after the date of entry of this judgment, or at such other date as is agreed to by

the parties with the consent and approval of said Special Master in Chancery.

6. The fees and costs of the Special Master in Chancery shall be fixed by the court and assessed as costs.

7. The court enters no award for attorneys' fees in favor of the plaintiff herein for the reason that the court considers the plaintiff prosecuted the original Complaint against defendant until immediately before trial when plaintiff filed an Amended Complaint omitting certain allegations for which action plaintiff should pay attorneys' fees to the defendant. The court has offset such attorneys' fees against those it would otherwise award to plaintiff herein.

8. Plaintiff is awarded its taxable costs.

## FINDINGS OF FACT

### The Parties and Jurisdiction

1. Ellipse Corporation (hereinafter Ellipse) is an Illinois Corporation. Ellipse was issued its charter on August 11, 1945. Ellipse owns Patent 2,628,568 issued February 17, 1953.

2. The original Complaint herein was filed August 2, 1966. Ellipse moved under Rule 15 Fed.R.Civ.P. for leave to file an Amended Complaint which, in effect, omits allegations that certain devices, constructed subsequent to issuance of Patent 2,628,568, embodied inventions of said patent. No evidence was introduced in support of those allegations appearing in the original Complaint and now omitted in the Amended Complaint.

3. Ford Motor Company (hereinafter Ford) is a corporation with a regular and established place of business in the Judicial District in which this suit has been brought. Ford has sold in this District, prior to filing of the original Complaint, power-steering slipper pumps that have been charged, both in the original Complaint and in the Amended Complaint, with infringement of Patent 2,-628,568.

### Background of the Plaintiff, the Patent, and this Lawsuit

4. Marvin L. Rhine (hereinafter Rhine), the inventor of Patent 2,628,568, was one of the incorporators of Ellipse. Simon H. Moss (hereinafter Moss) met Rhine through a common interest in machinery. Rhine was not educated as an engineer, but was a dreamer (DX 232, p. 18). Moss was sufficiently impressed by Rhine and by Rhine's ideas for a small pump that Ellipse was formed to develop and promote Rhine's pumps (Tr. 49, 53). Moss was one of the incorporators of Ellipse and has served as president of Plaintiff since issuance of the charter.

5. After Ellipse was established as a corporation, Rhine was a salaried employee of the corporation and served as its vice-president. Rhine constructed and tested a balanced slipper pump with an elliptical stator cavity and slippers of the outline shown in Figure 7 of the patent (Tr. 55, 58). This pump, and Rhine's ideas for various slipper shapes to be used in such a balanced slipper pump were used as the basis of an application for patent (Tr. 56). An application for patent, based on Rhine's balanced slipper pump with elliptical stator cavity, was filed on April 26, 1946. This patent application was assigned to Ellipse and it ultimately issued as Patent 2,628,568, the patent in suit.

6. Ellipse's business, of attempting to make and sell slipper pumps of both balanced and un-balanced design, was carried out during 1946–1948. The business did not prosper. Neither Moss nor Rhine had the education or ability to properly organize and operate a manufacturing facility.

7. Although regular manufacturing operations terminated in 1948, Ellipse, with Moss as its president, persisted after 1948 in prosecution of the patent application on the balanced slipper pump design. Prosecution of said application resulted in issuance of the patent in suit on February 17, 1953.

8. Ellipse with Moss as its president, also persisted after 1948 in seeking to interest other companies to use slipper pumps. Along this line of endeavor, Ellipse established contact with Ford in 1956 (Tr. 71, PX 4–A). As a result of that contact, Ford issued a purchase order to Ellipse on December 3, 1956 for Ellipse to deliver to Ford two experimental slipper pumps at a purchase price of $4000.00 (Tr. 73–74, PX 4–H, 4–I). In 1957, Ellipse delivered two unbalanced slipper pumps to Ford (Tr. 78). The price for the two pumps was amended in 1957 by agreement of Ford to $5,000.00 (Tr. 75, PX 4–N). Under the written terms of the purchase order of December 3, 1956, no license was granted to Ford under patents owned by Ellipse.

9. Ellipse's president, Moss, believing that ideas from Ellipse's slipper pumps had been adopted by Ford, called Ford's attention to patent 2,628,568, by causing a charge of infringement, together with an offer to negotiate a license, to be sent to Ford on December 21, 1962 (Tr. 78, PX 5–A).

10. Ford's attorneys replied on January 18, 1963 denying that there had been any infringement (PX 5–C). Slipper pumps of the type that were commercially made, used or sold by Ford prior to December 21, 1962 are not involved in this lawsuit.

11. In 1964, beginning with its manufacture of 1965 model automobiles, Ford began the manufacture and sale of a new slipper pump to serve as a power-steering pump for all Ford automobiles using power steering, with the exception of the "Lincoln" models. This power-steering slipper pump, which first appeared in 1965 model automobiles, is the accused device of this suit.

12. The accused power-steering slipper pump has an out-of-round stator cavity that provides a balanced slipper pump. Prior to Ford's manufacture and sale of its accused power-steering slipper pump for first use in its 1965 model automobiles, Ford had never commercially made, used or sold a slipper pump having an out-of-round stator cavity that provided balance.

*The Rhine Patent, The Inventions, and the Claims at Issue Herein*

13. The patent in suit (hereinafter the "Rhine patent") consists of two sheets of drawings, and three printed pages of text that include specifications, three claims, and a listing of 27 United States Patents and 2 Foreign Patents as "References Cited". (PX 3).

14. Rhine's application as originally filed included the two sheets of drawings (PX 71, p. 17–18), the specifications (PX 71, p. 1–7) and 20 claims (PX 71, p. 8–14). In the course of prosecution there were a number of editorial amendments of the original specifications and drawings (PX 71, p. 22, 30, 38–40, 65, 69, 72, 74–76), and, in response to a Patent Office requirement, there was added a section entitled "Practical Operation" (PX 71, p. 23–25), which appears in the printed patent at Column 4, lines 13–74.

15. In Office Action, Paper No. 7 (PX 71, p. 41–42), the Patent Office, noting that two separate inventions were disclosed, required division between claims directed to "a series type of pump" (Group I), and Group II claims directed to a pump structure that included a specific rotor and reciprocating blades, and also required clarification of an earlier response to a requirement of election of species within the Group II claims. The file wrapper makes it clear that claims in Group II were elected (PX 71, p. 43) and that Figure 7 was the preferred and elected species (PX 71, p. 35, 44).

16. The Rhine application, as originally filed and particularly the disclosure of the Figure 7 species, involves the nature and shape of the pump's stator, its rotor, and the blades that are driven along the stator cavity by the rotating rotor.

17. The objects of the Rhine patent (PX 3) which are relevant to the elected species are:

"One object of the invention is to provide a pump in which a rotor ro-

tates in a stator, the stator cavity being elliptical in shape and the rotor having pockets in which blades reciprocate radially with their outer ends following the wall of the stator cavity. (Col. 1, lines 3–8).

"A further object is to * * * effect intake of fluid at opposite points in the stator and displacement of fluid at intermediate opposite points * * (Col. 1, lines 20–26).

"Still a further object is to provide modified forms of rotor blades * * having certain structural details which increase their efficiency and improve the pumping action." (Col. 1, lines 33–37).

18. The Rhine patent discloses a "balanced slipper pump", as those terms are accepted today by those skilled in the art. The Rhine patent does not use either of the words "balanced" or "slipper".

The File Wrapper reference patents to Vickers (DX 210) and to Kendrick (DX 213) show that those skilled in the art of rotary pumps at the time of filing of the Rhine patent application knew that use of a stator cavity that was elliptical, or out-of-round as an equivalent of elliptical, for "intake of fluid at opposite points in the stator and displacement of fluid at intermediate opposite points" as disclosed in the Rhine patent (PX 3, Col. 1, lines 23–26), would produce a "balanced pump". Ford's engineers later appreciated this fact by using an out-of-round stator cavity to provide for balance in Ford's power-steering slipper pump. (PX 20).

One skilled in the art of rotary pumps at the time of filing of the Rhine patent application would have known that the "blades" of vane-type pumps, as in DX 210 and DX 213, are circumferentially thin and confined to radial movement in elongated slots without additional pumping action being effected by reason of the radial sliding movement of the blades in the confining slots, while "blades" of slipper-type pumps, as in DX 212, are circumferentially wide and

effect displacement-type pumping of liquid from the pockets in the rotors, which action is described in the Rhine patent as "there is a pocket formed ahead of the blade from which fluid is displaced * * *" and "* * * the stator cavity is supplemented by the spaces ahead of the blades in the rotor pockets * * *" (Col. 4, lines 1–9). Ford's engineers later showed their appreciation of these differences between vane-type pumps and slipper pumps, as reported in PX 45 (p. 11) and in PX 20.

The Rhine patent thus discloses a "balanced slipper pump" as those terms are understood by persons skilled in the art.

19. The Rhine patent discloses a balanced slipper pump wherein the outer face of each slipper "mis-matches" slightly with the wall of the stator cavity during all positions of rotation of the rotor, so as to achieve what is characterized today in the art as the "Kingsbury effect" in slipper pumps. The Rhine patent does not use the term "mis-match" or "Kingsbury effect".

One having knowledge of fundamental principles of geometry would know that, given an elliptical stator cavity as required by the Rhine patent (PX 3: Col. 1, line 5; Col. 2, line 37; Col. 3, line 34; Col. 4, line 4), and the requirement of the slippers that "their outer ends fit tightly against the inner face of the elliptical stator cavity" (PX 3: Col. 3, lines 32–34; Col. 1, lines 7–8), the relationship must always result in a "mis-match" between the outer face of the slipper and the wall of the stator cavity during all positions of rotation of the rotor. (Tr. 1226; 332, 338).

The Rhine patent thus discloses structure that can only produce a mis-match between the outer surface of the slipper and the wall of the stator cavity during all positions of the rotor. (Tr. 2284).

20. In the elected species of Fig. 7 of the Rhine patent, the slippers are provided with an inner periphery of substantially a half-circle in cross-sectional shape. Other shapes for the in-

ner periphery of slippers are shown in Figs. 2, 6 and 11 of the Rhine patent.

In the Fig. 7 species, and also in the other species of slippers disclosed in the Rhine patent, the circumferential and radial size dimensions of the slipper are substantially the same as the size dimensions of the rotor pocket into which the slipper fits. Rhine's specification brings out this feature by describing the "blade" as "of substantially a complementary shape with respect to pocket" (PX 3, Col. 3, lines 25–27). Rhine's specifications as originally filed do not require the slippers to be precisely "complementary" to their respective pockets, as follows both from the use of "substantially" in the foregoing description, and since Rhine advises that "Upon wear occurring the blades merely assume a new working range farther out in the pockets without substantially changing the relationship of the blades to the pockets" (PX 3, Col. 5, lines 2–5). The purpose of having blades substantially complementary to the pockets is to force as much fluid as possible out of the rotor pockets to achieve" * * * a very efficient pump with considerable capacity in spite of small radial movement of the rotor blades" (PX 3, Col. 4, lines 10–12).

21. Claim 3 of the Rhine patent contains a number of important recitations therein, including the following:

(a) "rotary fluid displacement device",

(b) "an out-of-round stator cavity",

(c) "but permit it (the blade) to rock therein with free movement in relation to said pocket"

(d) "the contact between the outer surface of the blade and the inner surface of the stator is area contact * * * the pivot action tending to keep the outer surface of the blade in said area contact with the stator during all positions of rotation of said rotor".

22. When Claim 3 of the Rhine patent is construed in the light of the specification, and both are read with a view to ascertaining the invention, it is deter-

mined that Claim 3 is for a combination of elements and:

(a) that the "free movement" set out in Finding 21 requires the "blades" of Claim 3 to be construed as "slippers";

(b) that the "out-of-round stator cavity" set out in Finding 21 requires the presence of an elliptical (or equivalent) stator cavity whose purpose is to provide for a pair of opposed inlets and outlets to the stator cavity;

(c) that "rotary fluid displacement device" must be construed in view of the foregoing limitations to mean "a rotary balanced slipper pump";

(d) and that the "area contact" between the outer surface of the slipper and the elliptical (or equivalent) stator cavity is a "mis-match" between surfaces that only appears to provide area contact for all positions of rotation of the rotor.

23. Claim 1 of the Rhine patent contains therein important recitations including the following:

(a) "fluid displacement device"

(b) "an out-of-round stator cavity"

(c) "blades received therein (in pockets in the rotor) for free movement relative to the pockets"

(d) "each of the blades being substantially a half-circle in cross-sectional shape"

(e) "each of said pockets having a similar shaped bottom"

(f) "said pockets being of substantially the same size as said blades to effect substantially complete displacement of fluid from said pockets".

24. When Claim 1 of the Rhine patent is construed in the light of the specification, and both are read with a view to ascertaining the invention, it is determined that the claim is for a combination of elements, and:

(a) that the "blades" are slippers;

(b) that "out-of-round" requires an elliptical or equivalent shape whose purpose is to provide opposed inlets and outlets;

(c) that the "fluid displacement device", in view of the said limitations, is a balanced slipper pump;

(d) that the "substantially a half-circle in cross-sectional shape" refers to the radially inner periphery of the slipper;

(e) and that the shape and size of the pockets are related "substantially" to the slippers for the purpose of effecting "substantially complete displacement of fluid from said pockets".

### The File Wrapper's Influence On Claim Construction

25. In Finding 18 above, it has been determined that the Rhine patent discloses a "balanced slipper pump". This is the only type of pump disclosed by Rhine.

Ford avers that Claim 3 should properly be interpreted to read on an un-balanced slipper pump. Ford asserts that changing the claim-word "elliptical" to "out-of-round" operated to so broaden the claims as to read on un-balanced slipper pumps. Ellipse asserts that "out-of-round" in Rhine's claims means elliptical, as disclosed in the specification for providing a balanced pump, or the equivalent of elliptical that achieves a balanced pump.

■ As a matter of law, an application for patent cannot be broadened by amendment so as to embrace an invention not described in the application as filed. The Rhine patent does not describe an un-balanced slipper pump. Claim 3 cannot embrace such a device.

There is nothing in the File Wrapper (PX 71) to establish that "out-of-round" as used in Claims 3 and 1 embraces un-balanced slipper pumps.

The File Wrapper discloses that the word "elliptical" appearing in the claims was "somewhat broadened by stating that it (the stator cavity) is out-of-round" (PX 71, p. 33). The said amendment occurred after the Patent Examiner had drawn attention (p. 19) to Vickers 1,989,900 (DX 210) and Kendrick 2,387,761 (DX 213). Vickers (DX 210) disclosed an elliptical stator cavity for a balanced vane pump. Kendrick (DX 213) disclosed a stator cavity which was out-of-round but not a true ellipse, but providing for a balanced vane pump. The File Wrapper shows that Rhine disclaimed being inventor of an elliptical stator cavity, so that he was "entitled to claims that are broader in this respect as long as they are limited to other patentable distinctions" (PX 71, p. 33).

26. In Finding 22 above, Rhine's Claim 3 has been construed, and it has been determined that the language therein that refers to "area contact" actually refers to a "mis-match" that only appears to provide area contact between the slipper and the stator cavity.

Ford asserts that the term "area contact" in Claim 3 can have but one meaning, namely to define the type of sliding surface-to-surface contact between a slipper and stator cavity as is found in the Blackmer DC 20 pump and the four Livermore patents cited as prior art. The principles of operation of the Blackmer DC 20 pump are the same as in Livermore 2,333,323 (Tr. 175).

There is conclusive evidence in the Record to establish that there can never be a surface-to-surface contact between a slipper and stator cavity where the stator cavity is elliptical, or equivalently out-of-round (Tr. 339–340, 2029, 2281–2283).

Rhine advised the Patent Office (PX 71, p. 55) that the type of contact existing between the walls of his slipper and stator cavity was different than the "constant contract of a blade surface wih the stator surface" as found in Livermore 2,333,323.

When the term "area contact" was introduced (p. 65–66) into application Claim 25 (Claim 3 of the patent), Rhine called attention to the fact that, in effect, a special type of "area contact" was involved, saying (p. 67) "The outer surface of the blade is *approximately* the same shape as the inner surface of the stator and therefore *this* area contact is secured * * *." (Emphasis supplied.)

The Patent Office had been alerted earlier to the fact that there was something unusual being claimed as occurring between the outer face of the slipper and the wall of the stator cavity when application Claim 25 as originally presented called for "one point of contact (between) the outer surface of the blade * * * with the inner surface of the stator" (PX 71, p. 48–49), and this was accompanied by an explanation (p. 54) that "one point of contact" produces "less wear and friction", but at the same time provided "a constant contact * * * of the outer surface of the blade with the inner surface of the stator".

There is nothing in the file wrapper to establish that "area contact" as found in Claim 3 means the type of surface-to-surface contact found in Livermore 2,333,-323. At the same time, the File Wrapper discloses that what amounts to a special type of "area contact" is involved in Claim 3.

27. In Finding 24 above, Rhine's Claim 1 is construed to be directed to a combination of a balanced slipper pump and slippers therein that have a substantially half-circle, cross-sectional shape to cooperate with pockets of a shape and size related "substantially" to the slippers for the purpose of effecting "substantially complete displacement of fluid from said pockets".

Ford asserts that the language of Rhine's Claim 1 is limited by file wrapper estoppel to require a construction which drives "out all fluid from the pocket when the blades are seated at the back of the pocket" (Br. 88).

Rhine's Claim 1 resulted from application Claim 23 that derived from application Claim 14. Claim 14 as originally filed called for the blades and pockets "having a complementary shape" (PX 71, p. 13). The Patent Office did not act on application Claim 14 in its first action (p. 19–21), but Rhine's attorney broadened the phrase "complementary shape" to "similar shaped bottoms" (PX 71, p. 28), and, noting the presence of references of Curtis and Stevenson, argued that the important features of amended Claim 14 were "the half-circle shape of blade" (p. 35, par. 1) that "have free radial movement relative to their pockets" (p. 35, par. 2).

Claim 14 was then rejected by the Patent Office "as unpatentable over Klise taken alone or with either one of Stevenson, Curtis or Deming" (p. 45). Rhine responded by rewriting Claim 14 as Claim 23 (p. 47). Comparison of Claims 14 and 23 show that Claim 23 added a recitation defining the radial movement as being "in order to contact the wall thereof (the stator cavity)", and added the closing phrase:

"said pockets being of substantially the same size as said blades to effect substantially complete displacement of fluid from said pockets in the seated positions of said blades".

In the accompanying argument, Rhine pointed out that Klise showed a roller, and the attorney stated: "The half-circle blade is therefore a distinct advance over Klise when Klise is taken alone" (p. 50). Rhine also argued the importance of the "size" limitation that had been added by amendment, stating (p. 51): "Thus any substitution of Stevenson's or Curtis' blades in Klise would still not anticipate claim 23 specifying as it does the size of the pocket with relation to the size of the blade". Rhine distinguished from the remaining rejection by arguing "Any substitution of Deming's arrangement in Klise * * * would require a sliding vane type of blade in Klise with a rocker packing bar as distinguished from a half-circle blade as called for in Claim 23." (p. 51–52).

Rhine emphasized his reliance upon, and the importance of, the phrases quoted hereinabove by stating "It is urged, therefore, that claim 23 has features in addition to former claim 14 which makes it patentable over the references." (p. 52).

■ Claim 1 is not limited by file wrapper estoppel to a construction which drives "out all fluid from the pockets when the blades are seated at the back

of the pocket" as contended by Ford, since that is not what the amendment resulting in allowance of the claim says. Claim 1 is limited by file wrapper estoppel so that it cannot be read on a pump that includes a roller such as shown in Klise. Claim 1 is limited by file wrapper estoppel to the "size" comparisons between pockets and blades as appears in the last phrase of Claim 1.

### Ford's Accused Power-Steering Pump And The Issue Of Infringement

28. Ford's accused power-steering pump is the subject of an internal report entitled "Power Steering Pump Analysis", in the Record as PX 20. The report admits and proclaims the fact that the proposed power-steering pump is a balanced slipper pump.

The report compares Ford's proposed balanced slipper pump with an un-balanced slipper pump, with roller pumps, and with a balanced vane-type pump, and concludes that the balanced slipper pump is more desirable than all the other pumps.

The report notes an unusual "surface contact" relationship between the slipper and cam surface (wall of the stator cavity) saying (PX 20, p. 10):

"The radius of curvature of the slipper in the proposed Thompson pump is five times greater than the current roller curvature used in the roller type pumps. This greater radius provides a surface contact between the cam surface and the slipper in a manner similar to the familiar Kingsbury effect. Increased surface contact reduces the unit pressure and the wear potential of the slipper type pump."

The so-called "Kingsbury effect" noted in the Ford report, PX 20, actually refers to the mis-match between the outer surface of the slipper and the wall of stator cavity. The so-called "Kingsbury effect," or mis-match of slipper and stator cavity surfaces, exists in Ford's accused power-steering pump during all positions of rotation of the pump's rotor.

29. All the features discussed in Findings 21 and 22 hereinabove, as appearing in Rhine's Claim 3, such as the "out-of-round stator cavity" that provides for a balanced slipper pump, and the existence of a mis-match between the surfaces of the slipper and stator cavity, are found in Ford's accused power-steering pump.

30. Ford's expert, Booth, admitted that if "area contact" appearing in Claim 3 refers to a mis-match that provides "apparent area contact" as Ellipse's witness Pigott had testified, then Claim 3 reads on Ford's power-steering slipper pump (Tr. 2201-2206).

31. Claim 3 reads on Ford's accused power-steering slipper pump.

32. Finding 27 above notes the existence of two file wrapper estoppels in Rhine's Claim 1, that limit the Claim from reading on pumps using "roller" elements as in Klise, or on pumps wherein rotor pockets are not "substantially the same size as said blades".

Ford's accused power-steering pump does not use "roller" elements such as shown in Klise. Ford's report, PX 20, specifically notes the difference between Ford's slipper and a "roller" type pump element.

In consideration of "size" comparisons between slippers and rotor pockets, the art shows that circumferential width and radial depth are involved (Livermore '131 patent, DX 211, Claim 1). As to circumferential width, Ford's witness Chiampa testified that the difference in circumferential width between the slipper and rotor pocket in Ford's accused power-steering pump is smaller than can be illustrated in drawings and is only about the size of a human hair (Tr. 2345). Ford's drawings in the Record herein, such as PX 34, show substantially the same relationship between the radial depth of the slipper and the rotor pocket.

33. Ford's power-steering slipper pumps do not avoid Rhine's Claim 1 on the basis of file wrapper estoppel.

34. Rhine's Claim 1 is directed to a combination that includes an out-of-round stator cavity that provides for a balanc-

ed slipper pump, and wherein the slippers are each "substantially a half-circle in cross-sectional shape" and positioned in a pocket with a similar shaped bottom, with the pockets being "substantially the same size as said blades" to effect substantially complete displacement of fluid from the pockets when the slippers are in their innermost position in the pocket.

35. Ford's power-steering s l i p p e r pump is balanced and provides the "size" relationship between slipper and rotor pocket as specified in Claim 1.

36. PX 75 shows that the inner periphery of Ford's slipper is substantially a half-circle in cross-sectional shape, as specified by Claim 1.

37. Rhine's Claim 1 does not require complete displacement of fluid from the rotor pocket. In Ford's power-steering slipper pump, the slipper occupies so much of the space in the rotor pocket when at its innermost position in the pocket (PX 34) that there does exist "substantially complete displacement of fluid" as specified by Claim 1. The Court has observed motion pictures (DX 248) showing operation of Ford's accused power-steering pump in slow motion. (Tr. 254–260). The "similar shaped bottom" of the pocket called for in Claim 1 is directed to the same objective as the "size" requirements of Claim 1, so that Ford's power-steering pump responds to this recitation on the basis of mechanical equivalents (Tr. 1347–1350).

38. Ford's power-steering s l i p p e r pump infringes Rhine's Claim 1 on the basis of mechanical equivalents, as Ford's pump uses a combination of substantially the same elements operating substantially in the same way to achieve substantially the same results.

█ 39. Ford asserts that the slipper of its power-steering pump adopted a curved inner periphery for reasons of ease of extrusion, quality control and a better seating for the spring rather than for any reasons disclosed in the Rhine patent. But such facts do not constitute a defense to a charge of patent infringement. The law entitles a patentee to

benefits flowing from his invention even though such benefits are not disclosed in the patent application as originally filed.

40. The Rhine patent, as well as the prior art, show that many different shapes of inner periphery of a slipper were available for adoption by Ford without any risk of infringing Rhine's Claim 1. The situation herein is similar to that in Diamond Rubber Co. of New York v. Consolidated Rubber Tire Co., 220 U.S. 428, 441, 31 S.Ct. 444, 450, 55 L.Ed. 527 (1911) wherein the Supreme Court said:

"The prior art was open to the rubber company. That 'art was crowded,' it says, 'with numerous prototypes and predecessors' of the Grant tire, and they, it is insisted, possessed all of the qualities which the dreams of experts attributed to the Grant tire. And yet the rubber company uses the Grant tire. It gives the tribute of its praise to the prior art; it gives the Grant tire the tribute of its imitation, * * *. And yet the narrowness of the claims seemed to make legal evasion easy. Why, then, was there not evasion by a variation of the details of the patented arrangement? Business interests urged to it as much as to infringement. We can find no answer except that given by the tire company: 'The patented organization must be one that is essential. Its use in the precise form described and shown in the patent must be inevitably necessary.' "

*The Prior Art And Ford's Allegations Of Patent Invalidity*

41. Ford asserts invalidity of Rhine's Claims in view of prior art under both 35 U.S.C. § 102 and § 103.

█ Under Graham v. John Deere Co. of Kansas City, Mo., 383 U.S. 1, 17, 86 S.Ct. 684, 694, 15 L.Ed.2d 545 (1966), the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the

obviousness or nonobviousness of the subject matter is to be determined.

■ Secondary considerations, tending to show subsequent recognition of the discoveries disclosed in the patent in suit and later attempts to patent improvements on the basic discovery of the patent in suit, are factors bearing on the question of obviousness, as noted in United States v. Adams, 383 U.S. 39, 52, 86 S. Ct. 708, 715, 15 L.Ed.2d 572 (1966).

42. There are three features, or differences, that distinguish Claim 3 from the prior art relied upon by Ford. Finding 22 above construes the language of Claim 3 as:

(a) directed to a "slipper" pump as distinguished from a "vane" pump;

(b) calling for a balanced slipper pump by reference to "an out-of-round stator cavity";

(c) requiring a mis-matching type of "area contact" between the outer face of the slipper and the stator cavity wall during all positions of rotation of the pump's rotor.

43. There are three features, or differences, that distinguish Claim 1 from the prior art relied upon by Ford. Finding 24 above construes the language of Claim 1 as:

(a) directed to a "slipper" pump as distinguished from a "vane" pump;

(b) calling for a balanced slipper pump by reference to "an out-of-round stator cavity";

(c) specifying a slipper shape whose radial inner periphery is "substantially a half-circle in cross-sectional shape" and which effects displacement pumping in a rotor pocket of "substantially the same size" as the slipper.

44. The prior art relied upon or discussed in Ford's Brief (p. 53–60) are:

(a) Phillips 1,495,526 (DX 209)

(b) Livermore 2,278,131 (DX 211)

(c) Livermore 2,333,323 (DX 212)

(d) Livermore 2,499,763 (DX 214)

(e) Livermore 2,599,927 (DX 215)

(f) Blackmer DC 20 pump (DX 109-B, 109-C)

(g) Vickers 1,989,900 (DX 210)

During the trial, Ford directed attention to the prior art patent of:

(h) Kendrick 2,387,761 (DX 213)

The prior art references of Phillips (DX 209), the '323 Livermore (DX 212), Vickers (DX 210) and Kendrick (DX 213) were file wrapper references cited by the Patent Examiner.

The Blackmer DC 20 pump employs the same principles as are disclosed in '323 Livermore (DX 212) (Tr. 175).

There is nothing in the Trial Record to suggest that any of the three other Livermore patents (DX 211, 214, 215) disclose features more pertinent as prior art than those disclosed in the cited '323 Livermore patent (DX 212).

Ford has not relied upon any reference more pertinent than those cited by the Patent Office during prosecution of the application resulting in the Rhine patent.

45. The relevant scope of the prior art is as follows:

(a) Phillips (DX 209) discloses an unbalanced pump with a circular-walled stator cavity against which the outer circular face of a wide blade makes matching area contact. Phillips does not respond to the characteristic of slipper pumps that require radial stroking, or fluid displacement, by the slippers as part of the pumping action of the pump.

(b) '131 Livermore (DX 211) discloses an un-balanced slipper pump that has a circular-walled stator cavity against which the outer circular face of a wide slipper makes matching area contact. The circumferential size of the wide slipper is substantially narrower than the width of the slipper pocket.

(c) '323 Livermore (DX 212) discloses an un-balanced slipper pump that has a circular-walled stator cavity against which the outer circular face of a wide slipper makes matching area contact. In DX 212, Livermore criticizes the circumferential shifting in DX 211 due to dif-

ference in size between slipper and rotor pocket, and seeks to limit such shifting.

(d) '763 Livermore (DX 214) discloses an un-balanced slipper pump that has a circular-walled stator cavity against which the outer circular face of a wide slipper makes matching area contact.

(e) '927 Livermore (DX 215) discloses an un-balanced slipper pump that has a stator cavity wall defined by circular arcs with the curvature of the "working arc" selected so that the outer circular face of a wide slipper makes matching area contact therewith. In DX 215, Livermore reports that best efficiency for a slipper pump is secured if the notches for the slippers are wider than the slipper width.

(f) Blackmer DC 20 pump (DX 109-B, 109-C) discloses an un-balanced slipper pump that has a circular-walled stator cavity against which the outer circular face of a wide slipper makes matching area contact.

(g) Vickers (DX 210 discloses a "Vane Type Pump" in which movement of elongated, thin, vanes is restricted to a generally radial direction by confinement in elongated slots. This "vane" pump is balanced. The wall of the stator cavity is of elliptical shape. The outer edges of the narrow vanes make line contact with the wall of the stator.

(h) Kendrick (DX 213) discloses a "vane" type fluid pressure device in which movement of elongated, thin, vanes is restricted to radial directions by confinement in elongated slots. This "vane" type device is balanced. The wall of the stator cavity has an out-of-round rather than a true elliptical shape against which the outer edges of the thin vanes makes line contact.

46. Neither Claim 3, nor Claim 1, can be read on any prior art reference described in Finding 45. Neither Claim 3, nor Claim 1, is anticipated (i. e., known, used or disclosed by others as delineated in 35 U.S.C. § 102) by any prior art reference.

47. In considering Ford's assertion of invalidity of Claim 3 as being obvious under 35 U.S.C. § 103, additional facts appearing from documents and publications become pertinent.

(A) On February 24, 1955, almost 9 years after Rhine's patent application was filed, Livermore filed application for patent 2,977,888 (PX 51) which discloses desirability of a partial mis-match of slipper and stator cavity surfaces in an un-balanced slipper pump.

(B) On August 3, 1955, one Jay M. Roth of Uhrichville, Ohio, as assignor to Mechanisms Company, filed application for patent 2,856,860 (PX 70) which discloses in Fig. 6 a balanced slipper pump defined by an elliptical stator cavity against which the outer face of a slipper moves to "engage in sliding arcuate contact, i. e., greater than line contact" (Col. 4, lines 27–28).

(C) On July 11, 1957, Livermore, Clark and Drutchas as co-inventors file application for patent 3,009,421 (PX 53), with Clark and Drutchas assigning their interest to Thompson Ramo Wooldridge, Inc. (hereinafter TRW). This patent discloses existence of complete mismatching between the outer surface of the slipper and the wall of the stator cavity of an un-balanced pump at all positions or rotation of the pump's rotor (Col. 3, lines 1–5). This patent also confirms that in each of patents 2,278,131 (DX 211); 2,-333, 323 (DX 212); 2,499,763 (DX 214); and 2,599,927 (DX 215); the construction was such as to "maintain a surface area contact with the pump bore in which the rotor operates" (Col. 1, lines 13–25).

(D) In April, 1960, Jay M. Roth of Mechanisms Co., Uhrichville, Ohio, published a technical article entitled "The Kingsbury slipper pump * * * design for higher pressures" in Applied Hydraulic Pneumatics magazine (PX 41, p. 73 et seq.). This article reports discovery that a mis-match between the outer face of a wide slipper and the wall of a stator cavity develops a "Kingsbury type fluid film" between such surfaces so that the outer faces of the slipper "alway make area contact instead of line contact".

This is the earliest-dated document in the Record which uses the term "Kingsbury" in connection with mis-matching surfaces in a slipper pump.

Drutchas recalled seeing the Roth article in the magazine after it was published in April, 1960 (Tr. 1121).

(E) On October 20, 1960, a technical paper entitled "The Slipper Type Pump For Automotive Hydraulics" by H. M. Clark of TRW was presented at the National Conference of Industrial Hydraulics at the Sherman Hotel in Chicago (PX 42). The paper discloses a number of forms of un-balanced slipper pumps. In one form of pump there is a U-shaped slipper whose outer face is described as

"a unique top contour which promotes the formation of an oil film by wedging oil between the slipper and the bore. This is an adaptation of the classic 'Kingsbury' effect * * *" (PX 42, p. 4).

This technical paper advises of the pre-existing problems and the challenges to the ingenuity of engineers. It reports the discovery that "the unique slipper pump principle provides many of the answers to this challenge" and that "the bore and slipper wear stresses are also reduced by this film of oil" (PX 42, p. 3–4).

(F) On January 9, 1961, a technical paper entitled "A New Transmission Slipper-Type Pump" by J. W. Guterman of Ford Motor Co. was presented at a Society of Automotive Engineers' meeting in Detroit (PX 45). The paper describes the un-balanced slipper pump used in Ford's transmission and reports that use of such a transmission slipper pump played "a major part" in successfully achieving the goal of "reduced design and manufacturing complexity, and improved reliability" in Ford's then-new transmission. The paper reports that the movement of the slipper into the slipper pocket is a pumping action that accounts for "approximately one-third of the total pump output" (PX 45, p. 11). The paper also reports that the relationship between the outer face of the slipper and the wall of the stator bore "promotes the formation of an oil film between the slipper and the bore" and that "The bore and slipper wear stresses also are reduced." (PX 45, p. 11–12).

(G) On March 7, 1963, Ford's Product Engineering Office" presented an internal report to Ford management entitled "Power Steering Pump Analysis" (PX 20). The report recommends adoption and use in Ford's automobiles of a balanced slipper pump for reasons that it is more desirable, when compared with existing vane type pumps, un-balanced slipper pumps and roller pumps (PX 20, 20A).

(H) On May 16, 1963, Hubert M. Clark and Gilbert H. Drutchas of TRW filed an application for patent 3,200,752 assigned to TRW (PX 39). This patent discloses a balanced slipper pump whose appearance (Fig. 4) corresponds substantially identically with the accused Ford power-steering pump as illustrated in the comparison chart of PX 20. The specification asserts an object of "obtaining the classic Kingsbury effect while stabilizing the slipper action through transition areas in a double lobed [balanced] pumping cavity." (PX 39, Col. 1, lines 60–66). The shape of the slipper is said to be " * * * an extrusion which in cross-section is somewhat circular, thereby to provide a curved inner wall 52 * * *" and " * * * the diameter of curvature of the inner wall 53 is substantially equal to the width of a corresponding notch 46" (PX 39, Col. 3, line 66, Col. 4, line 5).

(I) On August 8, 1963, Ford and TRW entered into an agreement respecting "power steering pumps" providing, *inter alia*, a license to Ford under TRW's patents in exchange for Ford's agreeing to purchase 35% of its requirements from TRW, and with TRW indemnifying Ford against all judgments and expenses resulting from patent infringement (PX 80).

48. With respect to "Kingsbury", whose name has become associated with mis-match between the outer surface of

a slipper and the wall of a stator cavity in slipper pump terminology, the Record discloses that what technology regards as the "Kingsbury-Michell" principle was used in the design of "Thrust Bearings" (PX 67, 68) developed near the beginning of the twentieth century, and utilizes a plurality of spaced tilting pillow blocks located in a confined space between two smooth plates (PX 69, p. 64).

49. Considering the group of Livermore patents consisting of DX 211, DX 212, DX 214, DX 215, PX 51, PX 53, the pattern that emerges shows that Livermore believed maintenance of surface area contact between the outer slipper face and the pump bore to be essential for operation of a slipper pump. Livermore's belief began as early as November 7, 1938 (filing date of DX 211) and persisted for many years. It is noted as late as July 11, 1957 in the opening paragraph of PX 53.

An essential concommitant of Livermore's belief in surface area contact was use of a circular stator cavity (later a circular working arc) which dictated that the pump always be un-balanced.

Livermore did eventually reach the conclusion that mis-match between the outer slipper face and the pump bore was desirable and required, but this conclusion was reached only by gradual stages of development (Tr. 1060–1072) when he first used only a partial mis-match in a slipper pump design in 1955 (PX 51), and later when he used a complete mis-match in a slipper pump design in 1957 (PX 53). Livermore's co-worker Drutchas explained that experimental work taught that "when the slipper radius was made the same as the cam (stator cavity) radius" one obtained area contact which was "not acceptable", but that the Kingsbury effect "is desirable and required" (Tr. 1027–1028).

Even after the desirability of complete mis-match was known in 1957, Livermore, as far as the Record herein is concerned, never suggested design of a balanced slipper pump.

Although Livermore had licensed companies such as Blackmer Pump Co. (PX 9), Borg-Warner (DX 235C) and Federal Industries (DX 235B), the Record fails to show that either he, or his associates Clark and Drutchas of TRW, or any of his licensees, made or suggested making a balanced slipper pump prior to November, 1960 when Ellipse's Moss disclosed the Rhine patent to Drutchas of TRW.

Ford's witness Booth testified that Ford's balanced slipper pump was the brainchild of Clark and Drutchas of TRW (Tr. 1718), but the Record does not disclose the date of conception of such a device at TRW.

50. There is nothing in the Record to explain why Rhine, not educated as an engineer, chose to make and patent a balanced slipper pump whose structure compelled a mis-match between the outer surface of the slipper and the wall of the stator cavity during all positions of rotation of the pump's rotor, or why Rhine preferred a slipper whose inner periphery was substantially a half-circle in cross-sectional shape.

It appears that Rhine proceeded along a path of design which long-accepted and patented design factors militated against. But by so proceeding, Rhine discovered and disclosed to the public a pump structure that constitutes the first balanced slipper pump, and he pioneered the first disclosure of a mis-match between the outer surface of a slipper and the wall of the stator cavity in a slipper pump for all positions of rotation of the rotor.

Although TRW and Ford, as experts in slipper pumps, rejected Ellipse's attempts to license them under the Rhine patent in 1961 and 1962, it is significant that TRW has subsequently recognized the significance of Rhine's invention by patenting devices that embody Rhine's developments of a balanced slipper pump and mis-matching of the slipper and stator cavity surfaces (PX 39, 40), and Ford has now sought out and obtained rights under such subsequent patents by becoming licensed thereunder (PX 80).

Rhine exercised more than ordinary skill in the art in developing the invention in the patent in suit. His discoveries, although perhaps the result of empirical actions and not based upon use of then-established scientific principles, has nevertheless added a new and valuable disclosure to the world's technical knowledge.

■ 51. The inventions patented as Claims 3 and 1 of the Rhine patent were not obvious to one having ordinary skill in the art at the time Rhine made his invention.

52. Ford asserts invalidity of the patent under 35 U.S.C. § 112. There is no evidence in the Record that anyone attempting to construct the patented device failed to do so. The Record actually establishes that Rhine built and tested a balanced pump with an elliptical stator cavity before taking it to the patent attorney for filing a patent application thereon (Tr. 55–56, 58). Claims 3 and 1 meet the requirements of 35 USC § 112, as they particularly point out and distinctly claim the subject matter that was regarded to be the inventions.

■ While certain terms of the Claims needed to be construed, the patentee was entitled to select his own language as long as his meaning was reasonably plan and specific. Findings 21–24 above establish that Rhine's meaning was plain, specific and distinct as required by § 112.

53. Ford asserts invalidity of Claim 3 on the basis that it is not supported by Fig. 7 of the patent. Ford's witness Booth admitted that the questioned phrase of Claim 3, involving the shifting line of contact between the slipper and the rotor, is common to the patent in suit and the prior art (Tr. 2008, 2014). Booth's direct testimony, which is the sole basis for this averment of invalidity, was not without conflict as to his qualifications and ability to testify on this issue (compare Tr. 1962–1966 with Tr. 1988, 2001). Ford has not carried its burden of proof of establishing invalidity of Claim 3 as not supported by

Fig. 7 of the patent, particularly in view of the statutory presumption of validity and correctness of patent Office determinations.

*The Testimony Of The Expert Witnesses*

54. Ellipse's case was based upon documentary evidence, testimony of adverse witnesses Walthall and Guterman of Ford, Clark and Drutchas of TRW, Brunson of Blackmer Pump Co., and affirmative witnesses Moss of Ellipse and an expert, Charles Pigott, a patent lawyer practicing in Chicago. Ford had actually called Clark of TRW and Brunson of Blackmer as deposition witnesses on Ford's behalf.

The major witness on Ford's behalf was Booth, previously an employee of TRW, and presented to the Court both as a practical and patent expert.

The principal conflict of testimony was between Ellipse's expert, Pigott, and Ford's expert, Booth. The reason for the conflict of testimony was the premises of their respective testimony. Booth premised his testimony on the assumption that the stator cavity on the Rhine patent is circular and not elliptical as set out in the specifications. When Booth was asked to testify to hypothetical questions that were premised on the fact the Rhine's specification says the stator cavity is elliptical, then Booth's testimony confirmed Pigott's and substantially all conflict between their respective testimony disappeared.

Booth admitted that he agreed with the major points of Pigott's testimony: that it was impossible to match the outer arcuate surface of a slipper with an elliptical bore (Tr. 2281–82); that Rhine's "slipper would not match the bore" (Tr. 2284); and that in Rhine there would be a mismatch for every position (Tr. 2284, 2283).

Booth's direct testimony that is premised upon his belief that Rhine's stator cavity is circular, rather than elliptical as stated in Rhine's specifications, cannot be accepted by the Court.

Booth conceded that his testimony, based on his premise of a circular stator cavity in Rhine, is inconsistent with the language in Claim 3 (Tr. 2300, 2302), but that Pigott's testimony and analysis was consistent with the language in Claim 3 (Tr. 2301).

When Booth testified to hypothetical questions premised upon Rhine's stator cavity being elliptical, which is the fact established by Rhine's specifications, then Booth admitted that Claims 3 and 1 do not read on any prior art patent or device (Tr. 2160, 2134–35, 2138, 2158) and admitted that Claim 3 does read directly on Ford's power-steering pump (Tr. 2201–2207).

Booth also admitted voluntarily that Ford's power-steering pump has "certain features that are claimed in the Rhine claims" which he could not report were to be found in any prior art patents or structures (Tr. 2200–2201).

### The Remaining Relief Sought By The Pleadings

55. After Ellipse called the Rhine patent to Ford's attention by a letter dated December 21, 1962, and offered to negotiate a license with Ford on reasonable royalty terms (PX 5A), Ford's counsel, early in 1963, reported a "careful consideration" of the Rhine patent to determine its scope (PX 5B, 5C). Ford made no response to Ellipse's offer to negotiate a license, and responded obliquely to Ellipse's infringement charge by referring only to "pumps currently used in automobile of our manufacture" (PX 5C).

In January, 1963 when Ford carefully reviewed the Ellipse patent, it was true that Ford was then not using balanced power-steering slipper pumps in automobiles of Ford's manufacture, but Ford had knowledge late in 1962 that it planned to make and sell a balanced power-steering slipper pump utilizing a mis-match between the outer surface of the slipper and the wall of the stator cavity (Tr. 385–6, 493–495, DX 116A, B).

56. With full knowledge of the existence and scope of the Rhine patent, Ford deliberately proceeded in 1963 with plans to manufacture and sell a balanced slipper pump that included a mis-match between the outer surface of the slipper and the wall of the stator cavity.

Ford believed that the balanced slipper pump it proposed to make and sell was superior to existing pumps, and included what it proclaimed to be new and useful concepts (PX 20).

57. In 1964, buttressed by an agreement from TRW indemnifying Ford against all judgments and expenses resulting from patent infringement (PX 80), and despite notice, and knowledge of the scope of the Rhine patent that should have alerted any reasonable and prudent businessman to take care not to infringe the patent rights of another, Ford deliberately proceeded to make and sell the accused, balanced, power-steering, slipper pumps without regard to Ellipse's patent rights.

59. Ford called Clark of TRW to testify by deposition on Ford's behalf (Tr. 520). During the deposition, Clark testified about the importance of the "Kingsbury effect", or mis-match between surfaces, that was necessary in order that a slipper pump operate most successfully (Tr. 594–595). Clark also testified that the Blackmer pump did not have the "Kingsbury effect" (Tr. 620–621). Ford's engineer Walthall testified in his deposition that it was impossible to match a slipper surface with an out-of-round stator cavity (Tr. 332, 338). Therefore, Ford knew, or should then have known, that Ellipse's patent provided only a mis-match between the outer surface of the slipper and the wall of the elliptical or out-of-round stator cavity, and that infringement would be deliberate and willful.

60. Ford's expert, Booth, admitted agreeing with Pigott's testimony that the disclosure in Rhine's specifications required obtaining a mis-match between the slipper and the stator cavity for every position (Tr. 2284, 2281–83).

Booth also testified that the concept of asserting that Rhine's patent disclosed a circular bore (DX 243) was his idea reached after listening to testimony in Court (Tr. 2279).

With full knowledge that the Blackmer pump did not include the mismatch necessary to achieve the "Kingsbury effect" that Ford's power-steering slipper pump finds essential, and with Ellipse's charges of patent infringement made only against slipper pumps that included a mis-match necessary to achieve the so-called "Kingsbury effect" (PX 74), the fact that Ford has persisted throughout this trial, and through introduction of Booth's testimony, in attempting to equate the structure disclosed in Rhine, which provides only mis-matching surfaces, with the Blackmer pump which does not have mis-matching surfaces, makes this case an exceptional one as defined by 35 U.S.C. § 285.

## CONCLUSIONS OF LAW

1. This court has jurisdiction of the parties and the subject matter of this action.

2. The Rhine patent 2,628,568 issued to the Plaintiff, Ellipse, who owns all rights therein.

3. Claim 3 of the Rhine patent is valid and has been infringed by Defendant Ford's manufacture and/or sale of Ford's balanced, power-steering, slipper pump when sold in automobiles as original equipment or as replacement parts.

4. Claim 1 of the Rhine patent is valid and had been infringed by Defendant Ford's manufacture and/or sale of Ford's balanced, power-steering, slipper pump, when sold in automobiles as original equipment or as replacement parts.

5. Ellipse is entitled to an accounting to determine its damage under 35 U.S.C. § 284, in an amount not less than a reasonable royalty for the use made of the invention by the infringer, together with interest from the dates when damages accrued.

6. Ellipse is entitled to an award of reasonable attorneys' fees under 35 U.S.C. § 285 but said attorneys' fees are offset against attorneys' fees due to Ford because of the prosecution under the original Complaint until abandoned at the beginning of the trial herein.

7. Ellipse is awarded its taxable costs to be determined by the Clerk of the Court.